Slip Op. 11-52

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **JTEKT CORPORATION and KOYO CORPORATION OF U.S.A.**, et al., | |
| Plaintiffs, | |
| v. | |
| **UNITED STATES**, | **Before: Timothy C. Stanceu, Judge** |
| Defendant, | **Consol. Court No. 07-00377** |
| and | |
| **THE TIMKEN COMPANY**, | |
| Defendant-Intervenor. | |

## OPINION AND ORDER

[Ordering relief in the form of a remand on certain of plaintiffs' claims contesting the final results of the seventeenth administrative reviews of antidumping duty orders on ball bearings and parts thereof]

Dated: May 5, 2011

*Sidley Austin, LLP* (*Neil R. Ellis* and *Jill Caiazzo*) for plaintiffs JTEKT Corporation and Koyo Corporation of U.S.A.

*Baker & McKenzie, LLP* (Washington, District of Columbia) (*Kevin J. Sullivan* and *Kevin M. O'Brien*) for plaintiffs FYH Bearing Units USA, Inc. and Nippon Pillow Block Company Ltd.

*Crowell & Moring, LLP* (*Matthew P. Jaffe*) for plaintiffs NSK Corporation, NSK Ltd., and NSK Precision America, Inc.

*Baker & McKenzie, LLP* (*Kevin M. O'Brien, Christine M. Streatfeild, Diane A. MacDonald*, and *Joseph W. LaFramboise*) for plaintiffs American NTN Bearing Manufacturing Corp., NTN Bearing Corporation of America, NTN Bower Corporation, NTN Corporation, NTN Driveshaft, Inc., and NTN-BCA Corporation.

Crowell & Moring, LLP (*Daniel J. Cannistra* and *Alexander H. Schaefer*) for plaintiffs Aisin Seiki Company, Ltd. and Aisin Holdings of America, Inc.

Riggle & Craven (*David A. Riggle* and *Shitao Zhu*) for plaintiff Asahi Seiko Co., Ltd.

O'Melveny & Myers, LLP (*Nausheen Hassan* and *Greyson L. Bryan*) for plaintiffs Nachi Technology, Inc., Nachi-Fujikoshi Corporation, and Nachi America, Inc.

*Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Loren M. Preheim* and *Claudia Burke*); *Joanna Theiss, Aaron Kleiner, Thomas Beline, Brian Soiset,* and *Deborah R. King*, Office of Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

Stewart and Stewart (*Geert M. De Prest, Terence P. Stewart, William A. Fennell,* and *Lane S. Hurewitz*) for plaintiffs and defendant-intervenor The Timken Company.

Stanceu, Judge: JTEKT Corporation, formerly Koyo Seiko Company, Ltd.,[1] and Koyo

Corporation of U.S.A. (collectively, "JTEKT") brought an action under section 201 of the

Customs Court Act of 1980, 28 U.S.C. § 1581(c) (2006), to contest the final determination of the

United States Department of Commerce ("Commerce" or the "Department") in the seventeenth

administrative reviews ("AFBs 17 reviews" or "AFBs 17") of antidumping duty orders on ball

bearings and parts thereof ("subject merchandise") from France, Germany, Italy, Japan,

Singapore, and the United Kingdom.  Summons 1; *Ball Bearings & Parts Thereof from France,*

*Germany, Italy, Japan, Singapore, & the United Kingdom: Final Results of Antidumping Duty*

*Admin. Reviews & Rescission of Review in Part*, 72 Fed. Reg. 58,053, 58,053 (Oct. 12, 2007)

("*Final Results*"); *Issues & Decision Mem. for the Antidumping Duty Admin. Reviews of Ball*

*Bearings & Parts Thereof from France, Germany, Italy, Japan, Singapore, & the United*

---

[1] *Notice of Final Results of Antidumping Duty Changed-Circumstances Review: Ball Bearings & Parts Thereof from Japan*, 71 Fed. Reg. 26,452, 26,452-53 (May 5, 2006) (finding that JTEKT is the successor-in-interest to Koyo Seiko Company, Ltd.) ("*JTEKT-Koyo Successor Notice*").

*Kingdom for the Period of Review May 1, 2005, through April 30, 2006*, at 2 (Oct. 4, 2007)

("*Decision Mem.*").  The reviews applied to imports of subject merchandise made during the

period of May 1, 2005 through April 30, 2006 ("period of review" or "POR").  *Final Results*,

72 Fed. Reg. at 58,053.

Upon the motion of defendant-intervenor The Timken Company ("Timken") to

consolidate, the court consolidated JTEKT's action with six other cases.  Timken US

Corporation's Mot. to Consolidate 1 ("Mot. to Consolidate").  The six other groups of plaintiffs

in the consolidated cases (referred to in this Opinion and Order collectively with their affiliates)

are Asahi Seiko Co., Ltd. ("Asahi"); Aisin Seiki Company, Ltd. and Aisin Holdings of America,

Inc. (collectively "Aisin"); Nachi Technology, Inc., Nachi-Fujikoshi Corporation, and Nachi

America, Inc. (collectively "Nachi"); FYH Bearing Units USA, Inc. and Nippon Pillow Block

Company Ltd. (collectively, "NPB"); American NTN Bearing Manufacturing Corp., NTN

Bearing Corporation of America, NTN Bower Corporation, NTN Corporation, NTN Driveshaft,

Inc., and NTN-BCA Corporation (collectively, "NTN"); and NSK Corporation, NSK Ltd., and

NSK Precision America, Inc. (collectively, "NSK").

Before the court are the motions of each of the seven plaintiffs for judgment on the

agency record, submitted under USCIT Rule 56.2.  Also before the court are three other motions.

Defendant-intervenor moves to vacate the preliminary injunction against the liquidation of

entries with respect to Nachi.  Timken's Mot. to Vacate Prelim. Inj. with respect to Nachi

("Timken Mot.").  NTN filed a motion for a stay pending further administrative action on, or

alternatively for further briefing on, the zeroing issue, which motion is opposed by defendant and

defendant-intervenor.  Pl.'s Mot. to Stay Further Proceedings Pending the Finality of New

Antidumping Margin Methodology or, in the Alternative, Mot. to Allow Further Briefing.

("NTN Mot. to Stay").  NTN filed a motion to reply to defendant's and defendant-intervenor's

opposition.  Pl.'s Am. Unopposed Mot. for Leave to File a Reply to Def.'s Opp'n to the Mot. to

Stay ("NTN Mot. to Reply").

Aisin, Asahi, JTEKT, Nachi, NPB, NSK, and NTN (collectively, "plaintiffs") assert

claims contesting various decisions and determinations in the Final Results that affect the

antidumping duty order involving Japan.  The court addresses these claims in the respective

sections of Part II of this Opinion and Order, as follows: (A) claims of JTEKT, NPB, NTN,

Aisin, and Nachi challenging the application of Commerce's "zeroing" methodology to non-

dumped sales; (B) claims challenging the Department's revised model-match methodology, the

adoption of which JTEKT, NPB, NSK, and NTN oppose generally and the specific application of

which JTEKT, NPB, NSK, NTN, and Asahi challenge in certain respects; (C) NSK's claim that

Commerce unlawfully deducted certain benefit expenses when determining the constructed

export price of NSK's subject merchandise; and (D) the resolution by Commerce in a

redetermination upon voluntary remand ("First Remand Redetermination") of an issue affecting

the constructed export price ("CEP") for certain U.S. sales of Aisin's merchandise.  Defendant

and defendant-intervenor oppose plaintiffs' Rule 56.2 motions on various grounds.

The court remands the Final Results for reconsideration in response to the claims of the

five plaintiffs who challenge the Department's use of the zeroing methodology.  The court also

directs that Commerce reconsider the determinations challenged in certain claims by JTEKT,

NPB and NTN.  The court affirms the decision made in the First Remand Redetermination

pertaining to the CEP for certain U.S. sales of Aisin's merchandise.  The court denies Timken's

motion to vacate the preliminary injunction with respect to Nachi.

## I. BACKGROUND

The court sets forth below the procedural history of the administrative and judicial

proceedings in general terms common to all plaintiffs.  Additional background information

specific to the individual claims is presented in Part II of this Opinion and Order.

### A.  Administrative Proceedings

On May 15, 1989, Commerce issued antidumping duty orders on imports of ball bearings

from France, Germany, Italy, Japan, and the United Kingdom.[2]  On July 3, 2006, Commerce

initiated the seventeenth set of administrative reviews of these orders.  *Initiation of Antidumping*

*& Countervailing Duty Admin. Reviews*, 71 Fed. Reg. 37,892, 37,900 (July 3, 2006); *Decision*

*Mem.* 2.  Commerce issued the preliminary results of the administrative reviews ("Preliminary

Results") on June 6, 2007.  *Ball Bearings & Parts Thereof from France, Germany, Italy, Japan,*

*Singapore, & the United Kingdom: Prelim. Results of Antidumping Duty Admin. Reviews &*

*Intent to Rescind Review in Part*, 72 Fed. Reg. 31,271 (June 6, 2007) ("*Prelim. Results*").  On

October 12, 2007, Commerce issued the Final Results and incorporated by reference therein an

---

[2] *Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, Spherical Plain Bearings, & Parts Thereof From France*, 54 Fed. Reg. 20,902 (May 15, 1989); *Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, & Spherical Plain Bearings & Parts Thereof From the Federal Republic of Germany*, 54 Fed. Reg. 20,900 (May 15, 1989); *Antidumping Duty Orders: Ball Bearings & Cylindrical Roller Bearings, & Parts Thereof From Italy*, 54 Fed. Reg. 20,903 (May 15, 1989); *Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, & Spherical Plain Bearings, & Parts Thereof From Japan*, 54 Fed. Reg. 20,904 (May 15, 1989); *Antidumping Duty Orders & Amendments to the Final Determinations of Sales at Less Than Fair Value: Ball Bearings, & Cylindrical Roller Bearings & Parts Thereof From the United Kingdom*, 54 Fed. Reg. 20,910 (May 15, 1989).

internal issues and decision memorandum ("Decision Memorandum") containing the

Department's analysis of issues raised by interested parties.  *Final Results*, 72 Fed. Reg.

at 58,054-55; *Decision Mem.*   In the Final Results, Commerce assigned plaintiffs the following

dumping margins: Aisin, 6.15%; Asahi, 1.28%, JTEKT, 15.01%; Nachi, 11.46%; NPB, 26.89%;

NSK, 3.66%; and NTN, 7.76%.  *Final Results*, 72 Fed. Reg. at 58,054.

## B.  Judicial Review in the Consolidated Actions

JTEKT commenced this action on October 12, 2007.  Summons; Compl.  On

November 7, 2007, the court granted the consent motion of Timken to intervene on behalf of

defendant.  Order, Nov. 7, 2007.  Upon defendant-intervenor's motion, the court ordered

consolidation under Consolidated Court No. 07-00377 of *JTEKT Corp. v. United States*,

No. 07-00377, *NSK Ltd. v. United States*, No. 07-00387, *Aisin Seiki Co. v. United States*, No. 07-

00392, *NTN Corp. v. United States*, No. 07-00395, *Nippon Pillow Block Co. v. United States*,

No. 07-00398, *Asahi Seiko Co. v. United States*, No. 07-00409, and *Nachi-Fujikoshi Corp. v.

United States*, No. 07-00412.  Order, July 29, 2008; Mot. to Consolidate 1.  JTEKT, NPB, NSK,

NTN, Nachi, and Asahi each filed a motion for judgment upon the agency record in November

2008, which motions defendant and defendant-intervenor oppose in the entirety.[3]

_____

[3] Mem. of P. & A. in Supp. of Mot. of Pls. JTEKT Corp. & Koyo Corp. of U.S.A. for J.
on the Agency R. ("JTEKT Mem."); Mem. in Supp. of the Mot. for J. upon the Agency R.
Submitted on behalf of Pls. Nippon Pillow Block Co. Ltd & FYH Bearing Units USA, Inc.
("NPB Mem."); Mem. of P. & A. in Supp. of NSK's Mot. for J. on the Agency R. ("NSK
Mem."); Mem. in Supp. of Mot. for J. on the Agency R. Submitted on behalf of Pls. NTN Corp.,
NTN Bearing Corp. of Am., Am. NTN Bearing Mfg. Corp., NTN-BCA Corp., NTN-Bower
Corp., & NTN Driveshaft, Inc. ("NTN Mem."); Mem. in Supp. of a Mot. for J. on the Agency R.
Submitted by Pl. Asahi Seiko Co., Ltd., Pursuant to Rule 56.2 of the Rules of the U.S. Ct. of Int'l
Trade ("Asahi Mem."); Br. of Pls. Nachi-Fujikoshi Corp., Nachi America, Inc. & Nachi
Technology, Inc. in Supp. of Rule 56.2 Mot. for J. on the Agency R. ("Nachi Mem."); Def.'s
(continued...)

The court held an in-camera oral argument on August 20, 2009.  On September 3, 2009,

upon a consent motion for voluntary remand filed by defendant, the court ordered Commerce to

reconsider the methodology it used to calculate the constructed export price for Aisin.  Order,

Sept. 3, 2009 ("Aisin Remand Order").  Commerce submitted the First Remand Redetermination

on December 16, 2009, as to which Aisin raised no objection and defendant-intervenor took no

position.  Redetermination Pursuant to Remand ("First Remand Redetermination"); Aisin's

Comments on the Dec. 16, 2009 U.S. Dep't of Commerce Remand Determination 1 ("Aisin

Comments"); The Timken Co.'s Comments on the Dec. 16, 2009 U.S. Dep't of Commerce

Remand Redetermination 1 ("Timken Comments").

Timken filed its motion to vacate the injunction against liquidation as to Nachi on

December 7, 2010.  Timken Mot.  NTN filed its motion to stay or, alternatively, for further

briefing, on January 28, 2011.  NTN Mot. to Stay.  On February 28, 2011, NTN filed its motion

for leave to file a reply to Timken's and defendant's opposition to its motion to stay or for further

briefing.  NTN Mot. to Reply.

## II. Discussion

The court exercises jurisdiction pursuant to 28 U.S.C. § 1581(c), under which the Court

of International Trade is granted exclusive jurisdiction of any civil action commenced under

section 516A of the Tariff Act of 1930 ("Tariff Act" or the "Act"), 19 U.S.C. § 1516a (2006).

The court reviews the Final Results on the basis of the agency record.  *See* Customs Court Act,

§ 301, 28 U.S.C. § 2640(b) (2006); 19 U.S.C. § 1516a(b)(1)(B)(I) (2006).  Upon such review, the

---

[3](...continued)
Opp'n to Pls.' Mots. for J. on the Agency R. ("Def. Resp."); Resp. of the Timken Co. & Timken
US LLC to the Rule 56.2 Mots. of JTEKT Corp., et al. ("Def.-Intervenor Resp.").

court must "hold unlawful any determination, finding, or conclusion found," 19 U.S.C.

§ 1516a(b)(1), "to be unsupported by substantial evidence on the record, or otherwise not in

accordance with law." *Id.* § 1516a(b)(1)(B)(I).  "Substantial evidence is more than a mere

scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

### A.  Challenges to the Department's Zeroing Procedure

Commerce applied its "zeroing" methodology in AFBs 17, under which it assigned to

U.S. sales made above normal value a dumping margin of zero, instead of a negative margin,

when calculating weighted average dumping margins. *Decision Mem.* 8.  JTEKT, NPB, NTN,

Aisin, and Nachi challenge the use of this zeroing methodology in AFBs 17, arguing that use of

the zeroing methodology in an administrative review violates the U.S. antidumping laws and is

inconsistent with international obligations of the United States.

Asahi also included in its complaint a claim challenging the use of zeroing.  Asahi

declined to raise any issue as to zeroing in its Rule 56.2 motion for judgment upon the agency

record but then attempted to raise the zeroing issue in its reply brief.  Asahi Compl. ¶¶ 12-16;

Asahi Mem.; Reply Br. in Supp. of the Mot. for J. on the Agency R. Submitted by Pl. Asahi

Seiko Co., Ltd., Pursuant to Rule 56.2 of the Rules of the U.S. Ct. of Int'l Trade 5-6 ("Asahi

Reply").  In these circumstances, no motion for judgment on the agency record is before the court

on the zeroing claim in Asahi's complaint, which claim is now abandoned. *See* USCIT

Rule 56.2(c).

Nachi argues that the United States Court of Appeals for the Federal Circuit ("Court of

Appeals"), although upholding the Department's use of zeroing in administrative reviews, did

not conclude that zeroing is "*the correct* application of the statute" and, therefore, that this court

must consider the issue anew.  Nachi Mem. 9 (emphasis added) ("Thus, even though the Federal

Circuit has found the practice of zeroing a reasonable application, it has been silent as to whether

zeroing is the correct application of the statute, and this Court must answer that question as a

matter of first impression.").  Nachi argues, further, that Commerce's interpretation of the statute

to allow zeroing in administrative reviews merits no deference because it is an inconsistent

interpretation of the same language that applies in investigations, in which Commerce no longer

applies zeroing.  Nachi Mem. 10.

     Other plaintiffs urge the court to consider the effect of decisions of the World Trade

Organization ("WTO") holding zeroing impermissible under the WTO-related obligations of the

United States.  JTEKT Mem. 37-38; NPB Mem. 20-21; NTN Mem. 4-8.  They cite statements by

the United States that the United States intends to comply with its WTO obligations, JTEKT

Mem. 38; NPB Mem. 21-22; NTN Mem. 5-8, and challenge what they view as failure by the

United States to implement certain adverse WTO decisions, NPB Mem. 22; NTN Mem. 8-9;

Nachi Mem. 6-9.  NTN urges the court to "take this opportunity to hold that the United States

has, in fact, repudiated the practice of zeroing and to disallow its use in this review."  NTN

Mem. 8.  Similarly, Aisin argues that because Commerce "acknowledged the fault of its zeroing

methodology by agreeing to change its practice in investigations," Commerce should implement

the decision of the WTO "by eliminating zeroing in the context of this administrative review."

Mem. of Law of Pls. Aisin Seiki Co., Ltd. & Aisin Holdings of Am., Inc. in Supp. of Rule 56.2

Mot. for J. on the Agency R. 12-13 ("Aisin Mem."); *see also* JTEKT Mem. 37-38.  JTEKT and

NPB urge the court to remand the Final Results to allow Commerce to consider implementing a

WTO decision adverse to zeroing.  JTEKT Mem. 39; NPB Mem. 22.

   The Court of Appeals, in various circumstances, previously has upheld the Department's

use of zeroing in administrative reviews.  *SKF USA Inc. v. United States*, 630 F.3d 1365, 1375

(Fed. Cir. 2011) ("*SKF II*"); *Koyo Seiko Co. v. United States*, 551 F.3d 1286, 1290-91 (Fed. Cir.

2008) ("*Koyo III*"); *NSK Ltd. v. United States*, 510 F.3d 1375, 1379-80 (Fed. Cir. 2007).

Drawing a factual distinction with prior holdings, the Court of Appeals recently held that the

final results of an administrative review in which zeroing was used must be remanded to direct

Commerce to explain its interpreting the language of 19 U.S.C. § 1677(35) inconsistently with

respect to the use of zeroing in investigations and the use of zeroing in administrative reviews.

*Dongbu Steel Co. v. United States*, 635 F.3d 1363, 1371-73 (Fed. Cir. 2011).  Basing its holding

on the lack of a satisfactory explanation, the Court of Appeals held that the judgment of the

Court of International Trade affirming the use of zeroing in the administrative review at issue in

that case must be set aside.  The Court of Appeals reasoned that "[a]lthough 19 U.S.C.

§ 1677(35) is ambiguous with respect to zeroing and Commerce plays an important role in

resolving this gap in the statute, Commerce's discretion is not absolute" and concluded that

"Commerce must provide an explanation for why the statutory language supports its inconsistent

interpretation."  *Id.* at 1372.  The Court of Appeals commented that "[i]t may be that Commerce

cannot justify using opposite interpretations of 19 U.S.C. § 1677(35) in investigations and in

administrative reviews."  *Id.* at 1373.  The court concludes a remand is appropriate in this case to

direct Commerce to provide the explanation contemplated by the Court of Appeals in *Dongbu.*

On remand, the court will direct Commerce to reconsider and modify its decision to apply

zeroing in AFBs 17 or, alternatively, to set forth an explanation of how the language of the

statute as applied to the zeroing issue may be construed in one way with respect to investigations

and the opposite way with respect to administrative reviews.

Referring to a Federal Register notice published late last year by the Department on the

discontinuation of zeroing in administrative reviews, NTN moves for a stay of this case pending

a final notice of the Department's decision to eliminate zeroing in administrative reviews, or,

alternatively, the opportunity to submit additional briefing on the zeroing issue.  NTN Mot. to

Stay 1-2 (citing *Antidumping Proceedings: Calculation of the Weighted Average Dumping*

*Margin and Assessment Rate in Certain Antidumping Proceedings*, 75 Fed. Reg. 81,533

(Dec. 28, 2010) ("*Proposal*").  Defendant and defendant-intervenor oppose this motion.  Def.'s

Opp'n to Mot. to Stay; The Timken Co.'s Opp'n to NTN's Mot. for Stay, or, Alternatively,

Further Briefing.  In the notice on which NTN grounds its motion, Commerce proposes certain

changes to the method by which it calculates weighted-average margins in periodic and sunset

reviews, in response to adverse WTO decisions concluding that zeroing is contrary to the WTO

Antidumping Agreement.  *Proposal*, 75 Fed. Reg. at 81,534-35.  With respect to periodic

reviews, the Department proposes to "modify its methodology for calculating weighted average

margins of dumping and assessment rates to provide offsets for non dumped comparisons while

using monthly average-to-average comparisons in reviews in a manner that parallels the WTO-

consistent methodology the Department currently applies in original investigations." *Id.*

at 81,534.  Commerce proposes to amend its regulations, codified at 19 C.F.R. § 351.414, to

change its preference from the use of average-to-transaction comparisons in periodic reviews to

the use of monthly average-to-average comparisons. *Id.* at 81,534-35.

Because the court is remanding for further explanation the Department's decision to apply the zeroing methodology in AFBs 17, the court sees no need for the stay sought by NTN.  And because the parties will have the opportunity to comment on the results the Department issues in response to the remand, the court does not perceive the need for other, separate briefing on the zeroing issue at this time.  For these reasons, the court will deny NTN's motion for a stay or, alternatively, for additional briefing, and it also will deny as moot NTN's motion for leave to file a reply to defendant's and defendant-intervenor's opposition to that motion.

Additionally, the court will deny Timken's motion to vacate the preliminary injunction of the liquidation of entries with respect to Nachi.  That motion is premised on Timken's argument that the Court of Appeals consistently has upheld the Department's use of zeroing in administrative reviews.  Timken Mot. 1, 4.  As discussed above, the Court of Appeals in *Dongbu*, viewing the Department's statutory construction as inadequately explained, has now held that a judgment affirming the final results of an administrative review in which zeroing was applied must be set aside.

B.  The Application of the Model-Match Methodology in these Administrative Reviews

To determine a dumping margin, Commerce compares the U.S. price of the subject merchandise with the price of comparable merchandise (the "foreign like product") in the home market.  19 U.S.C. § 1677b (2006).  Commerce first attempts to match sales of the subject merchandise with sales of merchandise in the "home" market (*i.e.*, the actual home market or another comparison market) that is "identical" to the subject merchandise.  19 U.S.C. § 1677(16)(A) (2006).  In the absence of identical merchandise, Commerce attempts to match a sale of subject merchandise in the United States with a home market sale of similar merchandise.

*See id.* § 1677(16)(B)-(C).  If Commerce finds no sales of similar merchandise in the home

market, Commerce will determine normal value based on the constructed value of the subject

merchandise.  *Id.* § 1677b(a)(4).

   For the first fourteen administrative reviews of the subject merchandise, Commerce

identified similar merchandise using a model-match methodology (the "family" model-match

methodology) in which it compared bearings according to eight characteristics.  *Issues &*

*Decision Mem. for the Antidumping Duty Admin. Reviews of Ball Bearings & Parts Thereof from*

*France, Germany, Italy, Japan, Singapore, & the United Kingdom for the Period of Review*

*May 1, 2003, through April 30, 2004*, 19-26 (Sept. 16, 2005) ("*AFBs 15 Decision Mem.*").

Commerce grouped in the same "family" the bearings that matched according to those eight

characteristics for purposes of determining a foreign like product.  *Id.*  In the fifteenth

administrative reviews of the bearings orders ("AFBs 15"), Commerce adopted the current

methodology ("new model-match methodology"), in which Commerce applies a multi-step

process.  *Id.*; *see Ball Bearings & Parts Thereof from France, Germany, Italy, Japan, Singapore,*

*& the United Kingdom: Final Results of Antidumping Duty Admin. Reviews*, 70 Fed. Reg.

54,711, 54,712 (Sept. 16, 2005) ("*AFBs 15 Final Results*").  Commerce applied this new model-

match methodology in the AFBs 17 reviews.  *Decision Mem.* 14-20, 25-27.

   In the new model-match methodology, Commerce matches a ball bearing model sold in

the United States to one sold in the home market if the bearings are alike in each of four

characteristics: load direction, bearing design, number of rows of rolling elements, and precision

rating.  *AFBs 15 Decision Mem.* 19.  For bearing design, Commerce recognized seven ball

bearing design types in the AFBs 17 reviews: angular contact, self-aligning, deep groove, integral

shaft, thrust ball, housed, and insert. *Decision Mem.* 60. For bearings that are identical with

respect to the first four characteristics, Commerce identifies the most appropriate home market

ball bearing model according to four additional, quantitative characteristics: load rating, outer

diameter, inner diameter, and width. *AFBs 15 Decision Mem.* 19. In matching bearings

according to the four quantitative characteristics, Commerce excludes any potential matches in

which the sum of the deviations for those four quantitative characteristics exceeds 40%. *Id.*

Finally, in matching a bearing sold in the United States with a comparison market bearing,

Commerce applies a "difference-in-merchandise adjustment" ("DIFMER" adjustment) for any

difference in the variable cost of manufacturing and excludes any potential matches for which the

DIFMER adjustment would exceed 20% were the match to have been made. *See Decision*

*Mem.* 17 ("Because we applied our normal methodology of disregarding potential matches with a

difference-in-merchandise adjustment of greater than 20 percent, we regard all the matches we

actually made to be approximately equal in commercial value."); *Imp. Admin. Policy*

*Bulletin* 92.2 (July 29, 1992), http://ia.ita.doc.gov/policy/index.html (last visited May 5, 2011).

Several plaintiffs challenge the Department's decision to apply the new model-match

methodology in AFBs 17 instead of the old family methodology. Certain plaintiffs challenge

specifics of the application of the methodology in the AFBs 17 reviews, including the

Department's alleged failure to provide an adequate mechanism to contest inappropriate matches,

the Department's rejection of proposed additional bearing design types, and individual matches

that the Department made in AFBs 17.

### 1. Decision to Change the Model-Match Methodology

In responding to arguments challenging the new model match methodology made during

the reviews, Commerce cited in the Decision Memorandum the reasoning it stated in AFBs 15, in which it first applied the new methodology. *Decision Mem.* 14. Among the Department's reasons are that the new methodology reflects statutory preferences for using price-to-price comparisons, as opposed to constructed value, and for identifying the foreign like product by selecting the single most similar product. *Id.* Commerce further explained that the new methodology enables Commerce to use technological developments, *i.e.*, automation, to effectuate more matches and is more similar to the Department's normal model-match practice as applied to products generally. *Id.*

JTEKT, NPB, NSK, NTN, and Nachi challenge, on a number of grounds, the Department's decision to apply the new methodology rather than the previous family methodology. JTEKT argues that Commerce failed to present compelling reasons for the change. JTEKT Mem. 17-18. NTN contends that the family methodology serves as a benchmark against which Commerce must assess the new methodology. NTN Mem. 18-24. Similarly, NSK argues that to change its model-match methodology, Commerce must provide a reasoned analysis, which "in this context requires Commerce to demonstrate that its new methodology will result in a more accurate dumping margin calculation." NSK Mem. 13; *see* NSK Reply 2-4. Addressing Commerce's claim that the new methodology allows more price-to-price comparisons, JTEKT, NPB, and NSK argue that the new methodology compares dissimilar merchandise and increases the number of comparisons only by adopting less exacting model match requirements. JTEKT Mem. 20; NPB Mem. 17; NSK Mem. 18. JTEKT adds that Commerce's rationale contradicts conclusions in past administrative reviews and that Commerce's interpretation of the statute is contrary to congressional intent. JTEKT

Mem. 20-24. JTEKT argues, further, that advanced technology does not justify a change in the model-match methodology. JTEKT 27-29. JTEKT, NPB, NSK, and NTN argue generally that Commerce failed to provide substantial record evidence in support of its reasons for changing the model-match methodology. JTEKT Mem. 18, 25-27; NPB Mem. 16-17; NSK Mem. 12-13; NTN Mem. 20-24.

The Court of Appeals has upheld the Department's decision to discontinue the family methodology in favor of a version of the new model-match methodology that, in essential features, was the same as the methodology applied in AFBs 17, concluding that "we have specifically affirmed changes to the model-match methodologies by Commerce where reasonable." *SKF USA, Inc. v. United States*, 537 F.3d. 1373, 1380 ("*SKF I*"). Plaintiffs argue, in effect, that as to AFBs 17, Commerce must meet a standard more stringent than this.

The Court of Appeals previously rejected arguments similar to those advanced by plaintiffs in this case, noting that "this statute 'is silent with respect to the methodology that Commerce must use to match a U.S. product with a suitable home-market product.'" *SKF I*, 537 F.3d at 1379 (quoting *Koyo Seiko Co. v. United States*, 66 F.3d 1204, 1209 (Fed. Cir. 1995) ("*Koyo I*")). Concluding that "Congress has granted Commerce considerable discretion to fashion the methodology used to determine what constitutes 'foreign like product' under the statute," the Court of Appeals deferred to the Department's choice of methodology as a reasonable construction of the antidumping statute. *Id.* (citing *Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1384 (Fed. Cir. 2001) ("*Pesquera Mares*"), which cites, in turn, *Koyo I*, 66 F.3d at 1209). The Court of Appeals concluded that Commerce was reasonable in seeking to improve accuracy, to select a model that would yield more price-to-price comparisons,

and to capitalize on technological advances that enable implementation of a more accurate

methodology.  *Id.* at 1380.

NSK argues that in *Koyo Seiko Co., Ltd. v. United States*, 31 CIT 1512, 516 F. Supp.

2d 1323 (2007) ("*Koyo II*"), the Court of International Trade erred in sustaining the Department's

use of the new model-match methodology.  NSK Mem. 20-22.  However, the Court of Appeals

affirmed *Koyo II* in sustaining the use of the methodology.  *Koyo III*, 551 F.3d at 1290 (citing

*SKF I*, 537 F.3d at 1379-80).  NSK argues, further, that certain of the matches made under the

new methodology were of merchandise deemed dissimilar under the prior family model-match

methodology and that Commerce failed to explain how merchandise previously found to be

dissimilar is now similar.  NSK Mem. 21.  This argument fails to convince the court that

shortcomings in the Department's explanation require a remand for a further explanation or a

change in the methodology.  One of the Department's stated reasons for making the change was

that the new model-match methodology, on average, will produce more matches and less reliance

on constructed value when compared to the predecessor.  *Decision Mem.* 14.  It does not logically

follow that matches not recognized under the family methodology are necessarily so dissimilar as

to be impermissible under the statute.  *See* 19 U.S.C. § 1677(16)(B), (C).

NPB argues that it detrimentally relied on the family model-match methodology by taking

that methodology into account in pricing its products, which resulted in an average antidumping

margin of 2.97% for the last six sets of administrative reviews that occurred under the family

model-match methodology.  NPB Mem. 17-19 (citing *Shikoku Chemicals Corp. v. United States*,

16 CIT 382, 387-89, 795 F. Supp. 417, 421-22 (1992).  NPB further argues that because

Commerce did not reveal the new methodology until the Final Results of the fifteenth

administrative reviews, five months into the POR for the current administrative reviews, NPB

could not timely adjust its pricing structure.  NPB Mem. 19.  NPB claims that as a result its

margin increased from 3.38% in the fourteenth administrative review to an average of 22.77% for

the fifteenth through seventeenth administrative reviews (including the 26.89% margin in

AFBs 17).  NPB Mem. 19.

 In rejecting a similar argument by NPB regarding the final results for the immediately

preceding review, the Court of International Trade observed that Commerce had determined that

NPB sold at dumped prices for three periods of review, *e.g.*, for the POR beginning May 1, 2003,

a margin of 15.51%; for the POR beginning May 1, 2002, a margin of 3.37%; and for the POR

beginning May 1, 2001, a margin of 4.82%.  *JTEKT Corp. v. United States*, 33 CIT __, __,

675 F. Supp. 2d 1206, 1221 (2009) ("*JTEKT I*").  Here also, NPB's reliance argument is

unconvincing.  The fact that the average of NPB's margins in recent reviews has been higher than

they were under the previous methodology, when the margins were neither zero nor de minimis,

is not a sufficient ground upon which the court may overturn the Department's model-match

methodology as applied to NPB in AFBs 17.

 NTN also raises an argument directed to the timing of the methodological change,

claiming that under the Administrative Procedure Act ("APA"), 5 U.S.C. § 553(d), Commerce

was required to notify affected parties of the new methodology at least thirty days prior to the

effective date and was not permitted to apply the new methodology retroactively.[4]  NTN

---

[4] The Administrative Procedure Act ("APA") provides, in pertinent part, that
 (d) [t]he required publication or service of a substantive rule shall be made not
less than 30 days before its effective date, except
  (1) a substantive rule which grants or recognizes an exemption or relieves

(continued...)

Mem. 13-17.  In making this argument, however, NTN acknowledges that Commerce provided

notice that it would apply a new model-match methodology two reviews ago (*i.e.*, in the fifteenth

administrative reviews) and that Commerce published a memorandum on May 6, 2005,

providing the criteria for the new model-match methodology.  NTN Mem. 14-15.  The period of

review at issue began on May 1, 2005.  *Final Results*, 72 Fed. Reg. at 58,053.  NTN states that

"respondents had no way of knowing the final form of the new methodology and the effect it

would have on entries already made during the seventeenth period of review" and contends that it

could not have known the effect of the new methodology until the publication of the final results

of AFBs 15 on September 12, 2005, which was several months into the period of review for

AFBs 17.  NTN Mem. 15; *Final Results*, 72 Fed. Reg. at 58,053.  The court finds no violation of

the 30-day effective date requirement in the APA.  "'Changes in methodology, like all other

antidumping review determinations, permissibly involve retroactive effect.'"  *SKF I*, 537 F.3d

at 1379 (quoting *Koyo II*, 31 CIT at 1520, 516 F. Supp. 2d at 1334).  NTN cites *Rhone Poulenc,

Inc. v. United States*, 14 CIT 364, 738 F. Supp. 541 (1990), in support of its argument of

defective notice, NTN Mem. 13-14.  This too is unconvincing.  That case is neither binding

precedent nor on point.  It concerned the effective date of a regulation, not the application of a

methodology in an antidumping duty administrative review.

---

[4](...continued)
a restriction:
    (2) interpretative rules and statements of policy; or
    (3) as otherwise provided by the agency for good cause found and
    published with the rule.
5 U.S.C. § 553(d).

NTN also argues that Commerce, in changing the model-match methodology and redefining "foreign like product," set forth a substantive rule subject to the notice-and-comment rulemaking procedures of the APA, 5 U.S.C. § 553.  NTN Mem. 9-13; NTN Reply 3.  In support of its argument, NTN cites *Parkdale Int'l, Ltd. v. United States*, 31 CIT __, __, 508 F. Supp. 2d 1338, 1357 (2007), *Alaska Prof'l Hunters Ass'n v. Fed. Aviation Admin.*, 177 F.3d 1030 (D.C. Cir. 1999), and *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622 (5th Cir. 2001).  NTN Mem. 10-13. None of these cases holds that Commerce must conduct a APA rulemaking procedure to change a model-match methodology applied in its antidumping proceedings.  As discussed above, "Commerce need only show that its methodology is permissible under the statute and that it had good reasons for the new methodology."  *Huvis Corp. v. United States*, 570 F.3d 1347, 1353 (Fed. Cir. 2009).  In *SKF I* and *Koyo III*, the Court of Appeals held that Commerce had provided adequate reasoning for changing the methodology, and the court finds in this case no independent basis to conclude that the change resulted in procedural unfairness.

In summary, the court concludes that the Department's decision to continue applying in AFBs 17 the new model-match methodology, in essentially the form found permissible in previous decisions of the Court of Appeals, must be sustained on review.

## 2.  Differences in Commercial Value and Commercial Use

Plaintiffs also challenge particular aspects of the new model-match methodology.  Asahi and JTEKT contend that the methodology, despite the DIFMER adjustment and DIFMER limit, unlawfully compares merchandise with different commercial values.  JTEKT argues that the DIFMER does not account adequately for differences in commercial value, JTEKT Mem. 26, and Asahi contends that Commerce failed to consider whether bearings in Japan and bearings in the

United States were approximately equal in commercial value when Commerce compared high

temperature bearings to standard bearings, Asahi Mem. 3, 5, 8.

Commerce applies the DIFMER adjustment under a general presumption that differences

in the variable cost of manufacturing will be reflected in the marketplace. *See Decision Mem.* 17

("Because we applied our normal methodology of disregarding potential matches with a

difference-in-merchandise adjustment of greater than 20 percent, we regard all the matches we

actually made to be approximately equal in commercial value."). The Court of Appeals affirmed

the new methodology, including the 20% DIFMER limit and the price adjustment for the amount

of the DIFMER, as a reasonable interpretation of the statute, which in 19 U.S.C.

§ 1677(16)(B)(iii) requires that matched sales be of merchandise "approximately equal in

commercial value." *Koyo III*, 551 F.3d at 1286, 1291-92, *aff'g Koyo II*, 31 CIT at 1525, 516 F.

Supp. 2d at 1338 (rejecting the argument that Commerce must apply a difference-in-merchandise

adjustment smaller than 20% and explaining that the DIFMER adjustment accounted for value

distortions). The statute, in requiring that the merchandise being compared be "approximately"

equal in value, allows the Department discretion that was not exceeded by the design of the new

model-match methodology. *See* 19 U.S.C. § 1677(16)(B)(iii). Nor, in the alternative, have

plaintiffs identified an instance in which the application of the new methodology in AFBs 17

yielded a match that exceeded the 20% DIFMER limit.

Asahi and JTEKT also argue that the new methodology permits matches of bearing

models that have different commercial uses. JTEKT Mem. 26; Asahi Mem. 3, 5, 8-10. JTEKT

maintains that Commerce's "new methodology results in comparisons of bearing models that

have strikingly different uses, contrary to the statutory requirement that 'foreign like product' be

merchandise 'like' the U.S. product '*in the purposes for which used*.'"  JTEKT Mem. 35

(quoting 19 U.S.C. § 1677(16)(B)(ii), (C)(ii)).  Asahi advances a similar statutory argument.

Asahi Mem. 3, 5-10.  JTEKT argues that Commerce's statement that the specific application is

not dispositive contradicts the statute.  JTEKT Mem. 35.

       As the court explained in *JTEKT Corp. v. United States*, 34 CIT __, __, 717 F. Supp. 2d

1322 (2010) ("*JTEKT II*"), "[w]hen read according to plain meaning, the statute allows

Commerce more discretion than JTEKT's argument would acknowledge. . . .  Congress did not

go so far as to require that the foreign like product and the subject merchandise be manufactured

for, or suitable for, the *identical* purpose or application."  *JTEKT II*, 34 CIT at __, 717 F. Supp.

2d at 1334 (citing 19 U.S.C. § 1677(16)(C)(ii)).  Commerce concluded in the Decision

Memorandum that "it is the rolling element that is dispositive as to whether a bearing can be

considered similar with respect to the component material or materials and in the purposes for

which bearings are used."  *Decision Mem.* 16.  In discussing the scope of the Department's

discretion in identifying the foreign like product in bearing cases, the Decision Memorandum

correctly relies on *Koyo I* for the principle that home market bearing models need not be

"'technically substitutable, purchased by the same type of customers, or applied to the same end

use as the U.S. model.'"  *Id.* (quoting *Koyo I*, 66 F.3d at 1210).

       In summary, the court rejects the arguments JTEKT and Asahi advance in support of their

general challenge to the new model-match methodology, including those JTEKT and Asahi base

specifically on the Department's adopting a methodology that matches models with different

commercial uses or values.

### 3.  Sum of the Deviations

NSK argues that Commerce should set the allowable sum-of-the-deviations ("sumdev")

to zero or a sum smaller than the current 40% and that doing so would be more consistent with

the prior family methodology.  NSK Mem. 19 (stating that "to the extent that the revised

methodology allows matches of dissimilar merchandise, using a smaller cap would result in

fewer dissimilar matches" and that "the 'zero deviation' is less of a step backward than the

methodology Commerce selected"); NSK Reply 5-7.  The Court of Appeals in *SKF I*, however,

addressed the lawfulness of this aspect of the Department's methodology:

> although the new methodology allows up to a 40 percent total deviation in
> dimensions and load rating, the methodology yields more accurate results because
> it matches the most similar product rather than merely pooling several models that
> matched as to eight characteristics but could vary significantly in price or cost,
> due to differences in materials for certain components or added features.

*SKF I*, 537 F.3d at 1379.  In evaluating the new methodology, the court does not view the 40%

sumdev limit in isolation.  For example, even where two bearings differ in width by the

maximum 40% and where the other three quantitative physical characteristics (inner diameter,

outer diameter, and loading rating) are identical, it is reasonable to presume that the additional

material and processing needed to make the wider bearing will be reflected in the variable cost of

manufacturing, and if that difference exceeds 20%, Commerce will decline to make the match.

Noting that the 40% sumdev limit was a "total deviation in dimensions and load rating," the

Court of Appeals concluded that the methodology was a reasonable interpretation of the statute.

*SKF I*, 537 F.3d at 1379.  The record in AFBs 17 does not permit the court to reach a different

conclusion in this case.  A smaller sumdev limit could be expected to result in matches of

bearings that, viewed in the aggregate, are more similar than the matches resulting from the new

methodology, but it would do so by generating fewer matches, with the need to resort more often to constructed value.  Balancing these competing considerations, Commerce was within its discretion in making the methodological choice to adopt a 40% cap.

### 4. Challenges to Individual Matches of Bearing Models

JTEKT, NPB, NSK, and Asahi claim that the Department's model-match methodology produced inappropriate matches that are contrary to the statutory criteria set out in 19 U.S.C. § 1677(16)(B) for determining the foreign like product.  JTEKT Mem. 34-35; NPB Mem. 8, 12-13, 15; NSK Reply 8; Asahi Mem. 5.  Except for one of the matches contested by JTEKT, for which JTEKT submitted supplemental information that the Department excluded from the administrative record, the court concludes that Commerce acted lawfully in making the individually contested matches.

### a. Matches Claimed Inappropriate by JTEKT

JTEKT claims that the new model-match methodology resulted in fourteen statutorily impermissible matches in AFBs 17, arguing that "the two models being compared had markedly different applications, commercial markets, and performance capabilities."  JTEKT Mem. 35. JTEKT contests matches of bearings that it claims "have strikingly different uses, contrary to the statutory requirement that 'foreign like product' be merchandise 'like' the U.S. product '*in the purposes for which used*.'"  *Id*. (quoting 19 U.S.C. §§ 1677(16)(B)(ii), (C)(ii)).  JTEKT also challenges the Department's decision to reject as untimely certain factual information on the bearings involved in those matches; JTEKT had offered that information after the publication of the Preliminary Results, by which time the regulatory deadline for submission of factual information already had passed.  *Id*. at 29-34.  Further, JTEKT objects that "the Department

failed to analyze the evidence of specific mismatches placed on the record by JTEKT and

dismissed the identified mismatches with a one-sentence assertion that they were not

inappropriate in light of the Department's statutory interpretation." *Id.* at 34 (citing *Decision*

*Mem*. at 23-24). According to JTEKT, "there is *no* record evidence to support the Department's

conclusion to include these specific matches in its calculation of JTEKT's dumping margin." *Id.*

at 36. JTEKT urges a remand ordering Commerce to recalculate JTEKT's margin without

relying on the contested matches and to establish a procedure for evaluating inappropriate

matches in subsequent administrative reviews. *Id.* at 37; JTEKT Reply 3-4.

    For details on the matches it contests, JTEKT directs the court to exhibits in the case brief

it submitted during the review, which address in detail only three of those matches. JTEKT

Mem. 35 (citing Japan-Specific Case Brief of Respondents JTEKT Corp. (formerly known as

Koyo Seiko Co., Ltd.) & Koyo Corp. of U.S.A., exhibits 1-2, (Sept. 7, 2007) (Admin. R. Doc.

No. 515) ("Revised Japan-Specific Case Brief"). JTEKT's first contested match compared a

"custom designed" U.S. bearing with a home market "standard 'off-the-shelf' model that has

general application." Revised Japan-Specific Case Brief, exhibit 1, 1. The U.S. bearing, which

underwent a form of special processing that the home market bearing did not, was significantly

narrower. *Id.* JTEKT argued below, and again here, that "matching these two models ignores

the significant difference in their technical characteristics and commercial value." *Id.* JTEKT

argues that the two models satisfied the sumdev and DIFMER limitations "simply because they

happen to have similar costs," with the higher processing costs of the wider home market model

counterbalanced by the costs of the special processing necessary for the U.S. model. *Id.* at

exhibit 1, 2.  The court concludes that JTEKT has failed to make the case that this match is

impermissible under 19 U.S.C. § 1677(16).

The differences relied upon by JTEKT, *i.e.*, that one of the bearings is custom designed

and the other is "off the shelf," that they differ significantly as to width, and that one underwent a

special type of processing, are addressed generally by the sumdev, the DIFMER limit, and the

DIFMER adjustment.  JTEKT offers no convincing argument as to why the differences in

"technical characteristics," *i.e.*, the differences in width and in the processing, preclude a

reasonable match despite the sumdev and DIFMER.  JTEKT's arguments grounded in the

difference in commercial value also fail to persuade the court.  The DIFMER adjustment, as

discussed *supra*, presumes that differences in the variable cost of manufacturing will be reflected

in the marketplace, a presumption that the court does not view as unreasonable when coupled

with the 20% DIFMER limit and adjustment.

The court has examined the additional information excluded by Commerce that relates to

the first match challenged by JTEKT.  *See Letter from Office Dir. to Sidley Austin LLP* (Aug. 31,

2007) (Admin. R. Doc. No. 507); Mem. of P. & A. in Supp. of Mot. of Pls. JTEKT Corp. &

Koyo Corp. of U.S.A. for J. on the Agency R. (*Conf. Version*), exhibit C, Japan-Specific Case

Brief of Respondents JTEKT Corp. (formerly known as Koyo Seiko Co., Ltd.) & Koyo Corp. of

U.S.A., exhibit 1, 1-3 (July 9, 2007) ("Unredacted Japan-Specific Case Brief").  That

information, had it been included in the record, would not have changed the court's decision.

The most significant item of additional information concerns use: the two bearings are intended

for use in different types of machines.  *See* Unredacted Japan-Specific Case Brief, exhibit 1, 1-3.

Again, the statute requires that the foreign like product be "like" the subject merchandise in "the

purposes for which used"; it does not require that the like product and the subject merchandise be

suitable for exactly the same use.  *See* 19 U.S.C. § 1677(16)(B)(2).

For almost identical reasons, JTEKT's objection to the second match is also

unpersuasive.  JTEKT argued below, and again here, that the home market model "is of a

standard design that is listed in Koyo's catalogues" while the U.S. model "was specially designed

to satisfy the requirements of the customer's specific application."  Revised Japan-Specific Case

Brief, exhibit 1, 3.  The two bearings differed with respect to load rating, but not enough to cause

the match to be rejected under the sumdev.  *See id*.  The difference in load rating resulted because

the U.S. model had a longer life span due to a different manufacturing process, and the home

market model had a physical feature missing from the U.S. model.  JTEKT objects that these two

differences offset one another with respect to the DIFMER and, as a result, the cost of

manufacturing the U.S. model "happens to be similar" to the cost of producing the home market

model.  *Id*. at exhibit 1, 4.  The physical differences relied upon by JTEKT are addressed

generally, but adequately, by the sumdev and the DIFMER, and under the latter Commerce did

not err in concluding that the two models of bearings being compared were "approximately equal

in commercial value" as required by statute.  *See* 19 U.S.C. § 1677(16).

The information Commerce excluded from the record as untimely, which is in the

unredacted version of JTEKT's case brief, is not sufficient to change the court's conclusion as to

this second match.   *See* Unredacted Japan-Specific Case Brief, exhibit 1, 4-6.  According to that

information, the two bearings are used in different types of machines and are physically different

in that "the internal geometry differs as a result of the number and size of the balls used in the

two models" and in that the U.S. model underwent a special process and includes a feature not

present in the home market model.  *See id*. at exhibit 1, 4.

In the third match it contests, JTEKT argues that the Department unlawfully matched two

bearings with "substantially different" physical characteristics and costs of manufacturing that

"differ significantly" due to a special process applied to the U.S. model.  Revised Japan-Specific

Case Brief, exhibit 1, 6.  The difference in manufacturing cost is insufficient to disallow the

match under the DIFMER limit.  This and the other information provided in JTEKT's

resubmitted case brief do not establish an unreasonable match.

With respect to the third contested match as well as the first two, the court has examined

the factual information JTEKT attempted to place on the record in its originally-submitted,

unredacted case brief, which information Commerce rejected as untimely.  *See* Unredacted

Japan-Specific Case Brief, exhibit 1, 7-9.  That information raises a question as to whether the

model-match methodology was correctly applied in this instance.  The Department is required to

match the bearing sold in the United States with a home market sale of a bearing of the same

design type. *See Decision Mem*. 60; 19 U.S.C. § 1677(16)(B).  The data JTEKT originally

submitted in its questionnaire response appears to show the two bearings to be of the same design

type. *See Letter from Sidley Austin LLP to Laurie Parkhill*, Section C ("U.S Sales"), 9 (Sept. 28,

2006) (Admin. R. Doc. No. 182) ("JTEKT Questionnaire Response").  The information the

Department required JTEKT to redact from its resubmitted case brief, however, suggests that this

is not the case.  *See* Unredacted Japan-Specific Case Brief, exhibit 1, 7-9.  There is no discussion

of this issue in the Decision Memorandum, which concludes generally that none of the matches

JTEKT identified was inappropriate and that the characteristics on which JTEKT based its

arguments were extraneous to the new model-match methodology, as well as the prior family

model-match methodology.  *Decision Mem.* 23-24.  It is not clear from the Decision

Memorandum or the record as a whole that the Department has adopted a general policy under

which it will refuse, or must refuse, to exercise discretion to consider new information on a

specific model match submitted with the case brief even though that new information suggests a

possible misapplication of the methodology due to a mistake of fact.  If Commerce decided to

apply so prejudicial a policy as that in refusing to consider JTEKT's challenge to this particular

model match, it did so without the compelling justification that such a decision would seem to

require.  Nor is there presented in the Decision Memorandum a reason why Commerce could not

have addressed, in the time remaining in the reviews, a match that possibly was impermissible

under the new model-match methodology.  The court, therefore, will order Commerce to

examine on remand its decision rejecting the challenge JTEKT makes to the third match.

     JTEKT described the remaining eleven matches it contests in a single exhibit to its case

brief.  *See* Revised Japan-Specific Case Brief, exhibit 2.  The information in that exhibit

indicates that each of the eleven matches satisfied the requirements of the model-match

methodology.[5]  *See id*.  The court's examination of this information reveals no ground on which

the court could conclude that the matches were unreasonable.

     Based on the record as a whole, the court does not agree with JTEKT's general

characterization that "the Department failed to analyze the evidence of specific mismatches

placed on the record by JTEKT and dismissed the identified mismatches with a one-sentence

assertion that they were not inappropriate in light of the Department's statutory interpretation."

---

[5] All information in this exhibit was submitted timely.

JTEKT Mem. 34 (citing *Decision Mem*. 23-24).  The Decision Memorandum contains ample

discussion of the reasons why its model-match methodology reached a reasonable result as to all

of the matches JTEKT challenges except for the third match, discussed above, for which the

information excluded from the record raises the factual issue of whether the methodology

was misapplied.

<u>b. Matches Claimed Inappropriate by NPB</u>

NPB argues that it is entitled to relief because of the way Commerce matched bearings in

applying the model-match methodology, citing two examples.  NPB Mem. 12-16.  According to

NPB, Commerce impermissibly matched housed bearings with unhoused bearings and matched

bearings with collars to bearings without collars.  *Id.* at 14.  The court concludes that relief is not

available on this claim because of NPB's failure to exhaust its administrative remedies in

contesting the specific matches it identifies to the court.

With respect to housed and unhoused bearings, NPB alleges that the Department

incorrectly compared a specific U.S. model, which was an unhoused bearing, to a specific

Japanese model, which was a housed bearing.  NPB Mem. 14; *see also Letter from Baker &*

*McKenzie to Sec'y of Commerce* 13 (Dec. 8, 2006) (Admin. R. Doc. No. 295) ("NPB

Supplemental Questionnaire").  As NPB correctly points out, the new model-match methodology

does not permit Commerce to match a housed bearing with an unhoused bearing.  NPB Mem. 14

("As Commerce recognized in the 15th administrative review, housed and unhoused bearings had

different design types and should not have been compared" (citation omitted)).  Defendant and

defendant-intervenor argue that NPB failed to raise this specific issue in the case brief filed with

Commerce during the review and therefore failed to exhaust its administrative remedies.  Def.

Resp. 15-16; Timken Resp. 34-35.

The Court of International Trade "shall, where appropriate, require the exhaustion of

administrative remedies."  28 U.S.C. § 2637(d) (2006).  Any issues that remain of concern to a

respondent in an administrative review as of the time of the issuance of the preliminary results,

including issues raised prior to that issuance, must be raised in the case brief, which is filed with

the Department within thirty days of the publication of the preliminary results.  *See* 19 C.F.R.

§ 351.309(c)(1)(ii), (c)(2) (2009).[6]  The court is unable to find in NPB's case brief an objection to

one or more instances in which Commerce matched a housed bearing model with an unhoused

bearing model and thereby misapplied the model-match methodology.  *See Case Brief of Nippon*

*Pillow Block Co. Ltd. & FYH Bearing Units USA, Inc.,* A-588-804, (July 10, 2007) (Admin. R.

Doc. No. 492) ("NPB Case Brief").  The court must give effect to the regulatory provision and

thereby conclude that NPB, by declining to address this point in its case brief, failed to exhaust

its administrative remedies on any matching of housed and unhoused bearing models that may

have occurred.

NPB submits that the court should recognize the "futility" exception to the exhaustion

requirement, arguing as follows:

> It is clear that the identification of specific mismatched models in NPB's case
> brief would have been futile.  Commerce has not established a process by which
> NPB could raise unreasonable model comparisons.  And, in the
> 15th administrative review where NPB identified a list of unreasonable model

---

[6] The regulation provides that "[t]he case brief must present all arguments that continue in the submitter's view to be relevant to the Secretary's . . . final results, including any arguments presented before the date of publication of the preliminary determination or preliminary results." 19 C.F.R. § 351.309(c)(2) (2009).

comparisons, Commerce did not conduct a comprehensive analysis of the
unreasonable model comparisons.

Reply Br. in Supp. of the Mot. for J. upon the Agency R. Submitted on behalf of Pls. Nippon

Pillow Block Co. Ltd. & FYH Bearing Units USA Inc. 11 ("NPB Reply").  NPB's futility

argument does not persuade the court.  "To show futility, a party must demonstrate that it 'would

be required to go through obviously useless motions in order to preserve [its] rights.'"  *Mittal*

*Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1384 (Fed. Cir. 2008) (quoting *Corus*

*Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007)).  NPB has not made a

convincing argument as to why raising in its case brief its objection to the Department's

matching of a housed bearing with an unhoused bearing would have been obviously useless.

NPB points to no Departmental communication from which the court could discern that

Commerce would have refused to address a respondent's timely objection that a particular match

was made inconsistently with the model-match methodology.

    In alleging a second mismatch, NPB argues that the Department unreasonably compared

bearings with collars to bearings without collars.  NPB Mem. 15.  Specifically, NPB cites the

matches Commerce made for two bearing models sold in the United States, claiming that

Commerce incorrectly compared two specific U.S. models, identified by model number, to a

specific Japanese model.  *Id.*; *see also* NPB Supplemental Questionnaire 13.  NPB argues that it

was unreasonable for Commerce to match the two U.S. models, which are "cylindrical bore

bearings that are fixed at the shaft using set screws," to the Japanese model, which is "a

cylindrical bore bearing with an eccentric collar on the outside of the inner ring for locking to the

shaft."  NPB Mem. 15.

Here also, the court concludes that NPB's case brief does not exhaust administrative remedies.  The court is unable to find within the case brief a specific objection to the matching of bearings designed to be secured to shafts with set screws to those designed to be secured to shafts with eccentric collars.  *See* NPB Case Brief.  The court concludes that NPB has not exhausted its administrative remedies on the issue of Commerce's matching of the two set-screw bearings to the eccentric collar bearing.

NPB raises a futility argument with respect to this second contested match.  *See* NPB Reply 9.  Despite some merit in this argument, the court concludes that an exception to the exhaustion requirement is not warranted here.  Absent a change in the model-match methodology, Commerce would not have considered a specific objection to the matching of NPB's bearings that attach to the shaft with set screws with an NPB bearing that attaches by means of an eccentric collar, and in that sense raising the second contested match in the case brief would have been futile.  As discussed later in this opinion, NPB proposed in a supplemental questionnaire response that Commerce incorporate into the model-match methodology additional physical characteristics, including the presence or absence of a collar to attach the bearing to a shaft.  NPB Supplemental Questionnaire 11-13.  Although NPB discussed in its case brief certain physical characteristics of its bearings for the Department to consider in its model-match methodology, *e.g.*, types of seals and lubricants and construction using ceramic materials, NPB, curiously, omitted from the discussion in its case brief any reference to incorporating physical characteristics into the methodology that would preclude matching of collared bearings with bearings that attach to the shaft by other means, such as set screws.  *See* NPB Case Brief 4.  The shortcoming in NPB's futility argument as to the matching of the set-screw bearings with the

collared bearing stems from its failure to raise in its case brief the related issue of the relevant

physical characteristics.  The court cannot conclude that it would have been obviously useless for

NPB to have done so.  According to the Decision Memorandum, Commerce appears to have

followed a general policy of not considering proposed changes to the model-match methodology

that are raised for the first time in the case brief, *Decision Mem*. 22, but Commerce did not

specifically state that any such question raised in a supplemental questionnaire response

necessarily would be rejected as untimely.

c. Matches Claimed Inappropriate by NSK

In its Rule 56.2 Motion for Judgment, NSK points to matches generated by the new

methodology that would not have occurred under the family methodology as evidence that the

new methodology impermissibly matches dissimilar merchandise.  NSK Mem. 16-18; NSK

Reply 4-7.  NSK stated that in its case brief before Commerce "NSK . . . identified specific

examples of egregious dissimilar matches that were the direct result of allowing variance in the

eight characteristics."  NSK Mem. 16 (citing to Case Brief on Behalf of NSK Ltd. & Affiliated

Companies, A-588-804, 3-4, Exhibit 14 (July 9, 2007) (Admin. R. Doc. No. 517) ("NSK Case

Brief"); NSK Reply 4, 8.  In its case brief, NSK presented a chart and associated discussion

identifying how the "new model methodology matches a U.S. bearing . . . with three home

models . . . that are significantly different."  NSK Case Brief 3.

Contrary to the implication in NSK's Rule 56.2 Motion for Judgment, the chart and

discussion in NSK's case brief do not allege that the identified "egregious dissimilar matches"

actually were made by the Department in AFBs 17.  *See* NSK Mem. 16-18; NSK Case Brief  3-4.

As discussed previously, the model-match methodology is based on a principle of matching a

bearing model sold in the United States with a single model sold in the comparison market.  The

court cannot conclude from NSK's allegations that this principle was not followed in AFBs 17

with respect to NSK's subject merchandise.  Due to the absence of a specific allegation that the

"egregious dissimilar matches" NSK identifies actually occurred, the court construes the

discussion in NSK's case brief to be alluding to potential matches that NSK believes would be

permissible under the sumdev and DIFMER, not actual matches the Department made in the

reviews at issue in this case.  NSK's argument reduces to a contention that the new model-match

methodology theoretically could result in matching models under the new methodology that

would have been rejected under the old methodology.  For the reasons discussed previously in

this Opinion and Order, the court rejects this argument.

      5.  Asahi's Objection to the Matching of Standard Bearings with High-Temperature Bearings

            Asahi argues that Commerce impermissibly matched "standard bearings" that Asahi sold

in the United States to "high temperature bearings" that Asahi sold in its home market of Japan.

Asahi Mem. 5.  Asahi argues that record evidence establishes that its high temperature bearings

have significant physical differences and different end uses than standard bearings and are not

approximately equal in commercial value to standard bearings.  *Id.* at 10.  Specifically, Asahi

argues that its high temperature bearings differ from standard bearings with respect to lubricants,

seals, internal clearances and slingers (*i.e.*, fittings that direct lubrication) and that high

temperature bearings sometimes have hardened, heat-stabilized rings.  *Id.* at 6-8.  Asahi argues

that it was impermissible under 19 U.S.C. § 1677(16)(B) for Commerce to match the high

temperature bearings with standard bearings because the former are not like standard bearings in

component materials, particularly lubricants, are adapted for harsh environments and therefore

are not used for like purposes, and are not approximately equal in commercial value.  *Id.* at 8-10.

Further, Asahi contends that high temperature bearings "sell for a much higher price  much more

than the costs would indicate, thus making the difmer adjustment ineffective."  *Id.* at 8.

        In the new model-match methodology, Commerce first matches bearings according to

four physical characteristics.  *AFBs 15 Decision Mem.* 19.  As discussed above, Commerce

designated in AFBs 17 seven design types: angular contact, self-aligning, deep groove, integral

shaft, thrust ball, housed bearing, and insert bearing.  *Decision Mem.* 60.  According to the

Decision Memorandum, Asahi proposed during the review that Commerce recognize additional

physical characteristics associated with high temperature bearings.  *Decision Mem.* 24.

Commerce rejected that proposal based on a finding that the proposal was made for the first time

in Asahi's case brief, a finding supported by the record evidence.  *Id.* at 22, 24.  Unlike NPB,

Asahi does not argue before the court that Commerce impermissibly rejected its proposal due to

timing.  Instead, Asahi makes the general claim that the matching of its standard bearings with its

high temperature bearings was inconsistent with statutory requirements for determining the

foreign like product.  The court rejects this claim.

        Commerce grounded its decision to apply the model-match methodology in 19 U.S.C.

§ 1677(16)(B).  *Decision Mem.* 14 ("We developed a revised methodology in order to reflect

more accurately the intent of section 771(16)(B) of the Act [19 U.S.C. § 1677(16)(B)] which is to

compare the subject merchandise to the single most-similar comparison-market model.").  As the

court discussed *supra*, that statutory provision does not require that the foreign like product have

precisely the same component materials and end uses as the subject merchandise.  *See* 19 U.S.C.

§ 1677(16)(B) (referring to merchandise "*like*" the subject merchandise in "component

materials" and "in the purposes for which used" (emphasis added)).  The provision requires that

the merchandise be "*approximately* equal in commercial value."  *Id.* (emphasis added).  Asahi's

general contention that high temperature bearings have higher prices relative to standard bearings

than their costs would indicate does not entitle Asahi to relief on its claim that Commerce

exceeded its statutory authority in matching high temperature bearings with standard bearings.

That the DIFMER adjustment, which is grounded in variable costs of production and not in

prices, does not adjust *perfectly* for differences in commercial value is not a convincing reason

why the court must reject the new model-match methodology.  The Department's reliance on the

DIFMER limit and DIFMER adjustment, when combined with other features of the model-match

methodology, reasonably effectuate the statutory requirement that the like product be

approximately equal in component value to the subject merchandise.  *See Koyo I,*

66 F.3d at 1209.

       Moreover, Commerce has discretion under the statutory language to address unique

physical characteristics of high temperature bearings in its model-match methodology, on a

review-by-review basis, but it also has discretion not to do so where, as here, Asahi has failed to

show that the statute required such a result and also failed to raise the question until its case brief.

Commerce acted reasonably in concluding that the timing of Asahi's proposal did not allow a full

opportunity to decide whether to make a change to the methodology.  As the Department

recognized, such a change would affect the treatment accorded to merchandise of other

respondents.

       For both of the reasons discussed above, the court rejects Asahi's claim that Commerce

acted contrary to 19 U.S.C. § 1677(16)(B) in AFBs 17 by applying the new model-match

methodology so as to match Asahi's U.S. sales of standard bearings with high temperature

bearings sold in the home market.  However, NPB makes a similar claim that, for reasons

discussed below, Commerce must consider on remand.  Should Commerce alter the model-match

methodology as applied in AFBs 17 in response to NPB's claim, it may consider whether it is

appropriate to apply that change with respect to other plaintiffs in this case.

### 6.  NPB's Proposed Additional Physical Characteristics for the Model-Match Methodology

As does Asahi, NPB claims that Commerce erred in refusing to incorporate certain

additional physical characteristics into the new model-match methodology for use in determining

matches of similar bearings.  NPB Mem. 2, 8, 10.  Similar to Asahi's argument is NPB's

argument that the model-match methodology as applied in AFBs 17, by ignoring these additional

physical characteristics, impermissibly matched standard bearings that NPB sold in the United

States to high temperature bearings and other specialized bearings that NPB sold in its home

market in Japan.  *Id.* at 10-11.  NPB proposed to Commerce, and reiterates in its Rule 56.2

motion, that the model-match methodology, at a minimum, should match bearings according to

types of seals (*e.g.*, standard or heat-proof), types of grease (*e.g.*, standard or heat-proof), ceramic

as opposed to non-ceramic, diameter of a second inner dimension, diameter of a second outer

dimension, diameter of a second width dimension, and diameter of a third width dimension.

*Id.* at 11.

During the review, Commerce refused to consider the merits of NPB's argument for

additional physical characteristics, rejecting the argument as having been made too late in the

reviews.  Commerce stated in the Decision Memorandum that "as we have stated before, we

welcome interested parties to provide comments on what additional physical characteristics we

should take into account in our model-matching methodology" but that "the time to make these

suggestions is at the beginning of a review so we can solicit comments from other interested

parties, not in the case brief after we have issued the preliminary results and it is too late in the

conduct of the reviews to analyze and/or implement the suggestions." *Decision Mem.* 16.

Commerce based its rejection of NPB's proposal on a finding of fact that "[n]o interested

party, including NPB, submitted any comments or made any suggestions on the model-matching

methodology in these administrative reviews prior to the case briefs." *Decision Mem.* 22.

Commerce found, specifically, that "[a]s it did in *AFBs 16*, NPB chose to wait until it[]

submitted its case brief to file any comments." *Id.* The evidence of record does not support, and

instead contradicts, these findings. NPB asked Commerce to consider additional physical

characteristics in its response to the Department's supplemental questionnaire, which NPB filed

on December 8, 2006, six months prior to the June 6, 2007 publication of the Preliminary

Results. *See* NPB Supplemental Questionnaire 10-13. In that response, NPB urged that if

Commerce applied the new model-match methodology in these reviews, it should include

additional characteristics, which "are important and must be taken into account specifically as

factors determining the most similar model." NPB Supplemental Questionnaire 13. NPB

described several proposed new characteristics: types of seals, types of grease, whether a bearing

is a ceramic or a non-ceramic bearing, inner ring diameters, types of slingers, whether the bearing

is a housed or unhoused bearing, and whether a bearing is collared or uncollared. *Id.* at 10-13.

The proposal in the supplemental questionnaire response was highly similar to the argument NPB

made in its case brief and reiterates before the court, which advocates additional characteristics

for types of seals, types of grease, whether or not a bearing is ceramic, diameter of a second inner

dimension, diameter of a second outer dimension, diameter of a second width dimension, and

diameter of a third width dimension.  NPB Mem. 11; *see* NPB Case Brief 4-6.

Implicitly acknowledging Commerce's erroneous findings as to the timing of NPB's

proposal, defendant criticizes the timing of that proposal, stating that "[i]nstead of proposing

additional criteria at the beginning of the review, NPB first made its proposal in a December

2006 supplemental questionnaire and later in its administrative case brief, which were submitted,

respectively, five months and 11 months after Commerce's July 2006 initiation of the underlying

administrative review."  Def. Resp. 12.  Commerce, however, based its refusal to consider NPB's

proposal on its erroneous finding that NPB did not make its proposal until its case brief.  *See*

*Decision Mem.* 22.  Contrary to the premise of defendant's argument, Commerce never made a

specific finding that it could not consider the merits of NPB's proposal for additional physical

characteristics, as set forth in the December 8, 2006 supplemental questionnaire response, due to

the date on which the supplemental questionnaire response was filed.  Therefore, the court

remands for reconsideration the Department's decision to reject NPB's proposal.

7.  NTN's Claim that Commerce Unlawfully Rejected NTN's Proposal for Additional Ball
Bearing Design Types

As discussed above, in the new model-match methodology Commerce first matches

bearings according to four physical characteristics: load direction, bearing design, number of

rows of rolling elements, and precision rating.  *AFBs 15 Decision Mem.* 19.  As also discussed

previously, Commerce designated in AFBs 17 seven design types: angular contact, self-aligning,

deep groove, integral shaft, thrust ball, housed bearing, and insert bearing.  *Decision Mem.* 60.

NTN claims that the group of seven design types designated by Commerce for AFBs 17 "fails to

account for the variations present in NTN's bearings" and that as a result Commerce "failed to

fulfill its obligation to match 'similar' U.S. and home market models" and "match[ed] physically

and functionally different products."  NTN Mem. 24-25.  During the administrative review, NTN

proposed that Commerce adopt numerous additional ball bearing design types "that it used in the

normal course of its business" and reported to Commerce during the reviews.  NTN Mem. 24.

Commerce rejected the proposal.  *Decision Mem.* 59-60.

In concluding the reviews, Commerce considered NTN's bearing models "equally similar

in component material or materials for model-matching purposes," reasoning that all share a ball

as a rolling element and can be classified into one of the seven recognized design types.  *Id.*

at 60.  Commerce stated that NTN's requested "bearing-design designations were, on many

occasions, distinguishable due to a single element of difference or an element of difference that is

not pertinent."  *Id.* at 61 (citing, as examples, "a different width of inner race or the type of bore,

the type of pillow material (i.e., cast iron vs. steel), the presence or absence of rubber rings or the

presence or absence of a dust cover, etc.").  Commerce further explained that some of NTN's

requests for separate design type designations "result in differences in product characteristics

such as load direction, load rating, number of rows, etc.," for which Commerce already accounts

in the new model-matching methodology. *Id.*  (providing an example in which "NTN

differentiates angular-contact bearing models into separate design types based on an angle of

point-of-contact or the number of points-of-contact," characteristics that Commerce considered

to "correlate directly with the load ratings and physical dimensions as well as, on occasion, the

precision rating of bearings").  Finally, Commerce concluded that a specific application for one

bearing may differ from the specific application of another with which the bearing is matched,

explaining, as it had in prior administrative reviews, that the function or application of different

bearings, standing alone, did not necessarily warrant a separate design designation because it is

the rolling element that is dispositive as to whether a bearing can be considered similar with

respect to the purposes for which bearings are used.  *Id.*

NTN contends that its "reported design types captured the significant differences between

bearings more accurately than the Department's design types" and states that it provided "a

description of each design, including the basis on which NTN believed that the design type

described a unique bearing, and drawings and pictures evidencing the differences between

bearings that the Department would otherwise match."  NTN Mem. 25.  NTN states that it

provided descriptions of its bearing designs divided into sixteen separate sections, with each

section setting forth a written description using pages from NTN's materials demonstrating

pictorially the written differences.  *Id*. at 26.  According to NTN, Commerce had ample

opportunity to request clarifying information but asked only a single question with respect to

NTN's design types, *i.e.*, whether NTN had sales of combination bearings incorporating deep-

groove and angular-contact bearings.  *Id*. at 25.  NTN specifically takes issue with the fact that

the design types used do not account for bearings with elements of more than one design type.

*Id*. at 26.  NTN offers the example of a bearing unit that incorporates a dust cover, emphasizing

"the reasoning behind separate design types for housed and insert bearings, *i.e.*, each incorporates

an additional part that allows it to be used for a specialized purpose."  *Id*. at 27.  NTN argues that

Commerce is inconsistent in rejecting the dust cover design while allowing a distinction between

housed and insert bearings.  *Id*.  Accordingly, NTN asks that the court remand the Final Results

and instruct Commerce to calculate NTN's margin using the design types submitted by NTN.

*Id*. at 28.

Defendant responds that NTN failed to establish several points: that the differences

among design types were "so significant" as to make insufficient the seven design types

designated by Commerce, that Commerce's DIFMER adjustment could not account for the

differences, and that NTN's "numerous proposed design types are necessary to [e]nsure matches

of comparable products when Commerce is faced with selecting similar merchandise because

there are no sales of identical merchandise." Def. Resp. 25.

The Court of Appeals for the Federal Circuit, in *Koyo III*, addressed a similar issue raised

by NTN in a prior administrative review, holding that "NTN has not demonstrated that

Commerce's choice of design types, including its adjustments, was unreasonable" and that "even

if Commerce had accepted NTN's proposals in the past, it was not required to do so in future

reviews." *Koyo III*, 551 F.3d at 1292. The Court of International Trade also addressed a similar

issue in *JTEKT I*, 33 CIT at __, 675 F. Supp. 2d at 1227-29. In *JTEKT I*, the Court of

International Trade "observe[d] that some of the additional design-type categories proposed by

NTN appear to describe ball bearings that fall within one, and only one, of Commerce's accepted

design-type categories." *JTEKT I*, 33 CIT at __, 675 F. Supp. 2d at 1228. With respect to the

bearings that fell within a single design type, the court affirmed Commerce's determination. *See*

*Id.* at __, 675 F. Supp. 2d at 1228-29. However, with respect to other design types that "appear

to fall within more than one of the Department's design-type categories," the court remanded for

Commerce to explain its methodology and reasoning for classifying a bearing in one design type

as opposed to another.  *Id.* at __, 675 F. Supp. 2d at 1228-29.  As it did in its challenge to the

final results of the prior administrative review, NTN raises this specific objection in support of

its claim.  *See* NTN Mem. 26 ("The Department's design types do not take into account bearings

that contain elements of more than one design type recognized by the Department.").  Commerce,

in this administrative review, did not explain how it categorized bearings that could be classified

according to more than one design type.  *See Decision Mem.* 59-62.  Although it might be

supposed that Commerce, in that instance, applies tie breaking rules identical or similar to those

by which it chooses a match from among potential matches of bearings for which design type is

not an issue, Commerce did not address this point in responding to NTN's argument.  Because

Commerce has failed to address NTN's argument by explaining its treatment of bearings that can

fit within two design types, the court will direct Commerce to resolve this issue upon remand.

### C.  NSK's Challenge to the Deduction by Commerce of Certain "Additional Benefit Expenses" In Determining the Constructed Export Price of NSK's Subject Merchandise

When determining constructed export price, Commerce must deduct expenses associated

with the sale of subject merchandise from the price at which that subject merchandise is first sold

in the United States to an unaffiliated purchaser if those expenses are incurred by, or for the

account of, the producer, exporter, or the affiliated seller in the United States.  19 U.S.C.

§ 1677a(d)(1) (2006).  The regulation states that in establishing CEP, "the Secretary will make

adjustments for expenses associated with commercial activities in the United States that relate to

the sale to an unaffiliated purchaser, no matter where or when paid."  19 C.F.R. § 351.402(b)

(2009).

In submitting its data, NSK accounted for its payments to a limited number of employees in the United States who are Japanese nationals by including the base salary paid and by excluding the additional benefits paid. NSK Mem. 9-10. NSK explains that for many prior reviews Commerce accepted NSK's reporting of salaries exclusive of benefits but then in the fifteenth administrative review "decided to deduct additional Japanese worker expenses from CEP." *Id*. at 11. NSK argues that the additional benefit expense "arose not because the individuals in question happened to be located in the United States, but because they happened to be Japanese nationals." *Id*. at 23. NSK maintains that "the Japanese worker benefits at issue did not arise out of the sale of AFBs in the United States; they arose before the AFB 17 U.S. sales took place out of NSK's legal obligation to pay these benefits generally to Japanese nationals" and that, therefore, the worker benefits constitute general expenses incurred by NSK for all sales regardless of the location of the purchaser. *Id*. at 24.

As NSK acknowledges, *see* NSK Mem. 11, the Court of International Trade previously has upheld the Department's determination to deduct from CEP both the base salaries and the additional benefit expenses in the fifteenth administrative review. The Court of Appeals in *Koyo III* affirmed the Court of International Trade's holding:

> The additional benefits NSK paid were expenses incurred for employees whose work related to United States sales. NSK chose to use Japanese-national employees in the United States in connection with its sales there. Those benefits were part of the employees' compensation that NSK paid. The Court of International Trade properly concluded that "there is no difference between these additional benefits and the base salary that NSK has admitted Commerce properly deducted from the [constructed export price]."

*Koyo III*, 551 F.3d at 1293 (internal citation omitted), *aff'g Koyo II*, 31 CIT 1512, 516 F. Supp. 2d 1323. NSK, in its challenge to the Final Results, sets forth as to these administrative reviews

the same legal issue that was presented in *Koyo III*.  NSK Mem. 11.  NSK maintains, however,

that the determination of the issue in this administrative review is unlawful because

> [c]ertain benefit expenses NSK incurred in the United States on behalf of
> Japanese workers . . . are not specifically related to the United States, nor can they
> be traced to any U.S. sales of subject merchandise, because the same benefits are
> provided to Japanese workers resident in other countries outside Japan.

*Id*. at 11-12.  NSK argues, further, that

> this expense arose not because the individuals in question happened to be located
> in the United States, but *because they happened to be Japanese nationals*.  That
> is, even before they had left Japan to assist their U.S. colleagues, even before a
> single AFB had left the factory in Japan to be sold in the United States, Japanese
> law obligated NSK to pay these additional benefits on behalf of these Japanese
> nationals.

*Id*. at 23 (emphasis added).  The fact that Japanese law may have required NSK to provide

certain benefits to the Japanese nationals is not relevant to the inquiry of whether these benefit

expenses are deductible from the price at which the merchandise is first sold in the United States.

Commerce, in the Decision Memorandum, explained that based on NSK's replies in its

questionnaire responses, "there is no dispute that the Japanese workers in question are engaged in

economic activity occurring in the United States and their activities relate to sales to unaffiliated

purchasers in the United States."  *Decision Mem.* 54.  As Commerce recognized, the crux of the

inquiry is whether the workers received the benefits in question, and whether those workers were

supporting sales in the United States of the subject merchandise to unaffiliated purchasers.

Substantial record evidence supports the findings that the workers did receive the benefits at

issue and that the workers were supporting the U.S. sales to unaffiliated purchasers.  NSK's

argument that these benefit "expenses are not specifically related to the United States, nor can

they be traced to any U.S. sales of subject merchandise, because the same benefits are provided

to Japanese workers resident in other countries outside Japan," NSK Mem. 11-12, is a non-

sequitur that does not refute Commerce's factual findings.  The court, therefore, will affirm this

aspect of the Final Results.

### D.  Commerce's Calculation of CEP for Certain of Aisin's Subject Merchandise

To determined the weighted-average dumping margin for Aisin in AFBs 17, Commerce

calculated CEP for a large number of Aisin's sales of ball bearings in the United States by using

cost and sales data for further-manufactured goods, *i.e.*, automotive transmissions.  *See Decision*

*Mem.* 62-64; Aisin Mem. 2.  According to Aisin,

> [a]s a consequence of applying the full loss on certain transmissions to an
> individual component (*i.e.*, bearing) and treating that amount as "dumping," the
> Department's calculations resulted in a $2.00 bearing attracting dumping in
> excess of $1,000 per unit, *i.e.*, a dumping margin in excess of 50,000 percent,
> despite the fact that the vast majority of this loss relates to components other than
> bearings.

Aisin Mem. 2.  Based on Commerce's determination of CEP, Commerce calculated a weighted-

average dumping margin of 6.15%.  *Final Results*, 72 Fed. Reg. at 58,054.  Aisin claims that the

methodology Commerce applied was unreasonable and yielded an absurd result.  Aisin Mem. 11.

Before the court, Commerce requested a voluntary remand "to examine the methodology it used

to calculate Aisin's sales of certain automotive service parts manufactured in the United States,

incorporating bearings produced in Japan, and sold below the production cost of the automotive

service part."  Def.'s Am. Mot. for Remand 2.

In the First Remand Redetermination, Commerce revised its calculation of CEP for

certain U.S. sales made by Aisin and, as a result, determined a dumping margin of 1.13%,

significantly lower than the 6.15% Commerce had determined in the Final Results.  First Remand

Redetermination 1; *Final Results*, 72 Fed. Reg. at 58,054.  Commerce explained that in situations

where the value added in the United States through further manufacturing (*i.e.*, the manufacture

of automotive transmissions) exceeds substantially the value of the subject merchandise (*i.e.*, ball

bearings), the possibility that the margin may be distorted increases as the proportion of the value

added in the United States becomes extremely large relative to the value of the subject

merchandise.  First Remand Redetermination 3-4.  Accordingly, Commerce excluded from its

calculation sales for which the margin calculated in AFBs 17 was greater than the production

cost of the imported bearing and for which the finished product was sold at prices below the

production cost of the transmission.  *Id*. at 4.  Commerce calculated the weighted-average

dumping margin with data for the remaining sales and then applied that margin to the excluded

sales as well.  *Id*. at 4-5.

 Neither Aisin nor Timken took a position in response to the First Remand

Redetermination.  Aisin Comments 1; Timken Comments 1.  Because the court concludes that

the First Remand Redetermination complies with the Order issued on September 2, 2009 and no

party has stated its opposition to the First Remand Redetermination, the court will affirm the

resolution in the First Remand Redetermination of the CEP of the sales of Aisin's subject

merchandise as affected by the use of the cost and sales data for the further-manufactured goods.

However, it is premature and unwarranted for the court to affirm the Department's 1.13%

redetermination of Aisin's weighted-average dumping margin.  Order, Sept. 2, 2009.  As did

certain other respondents in the review, Aisin contested the calculation of its weighted-average

dumping margin according to the Department's zeroing methodology.

Aisin did not raise the zeroing issue in a comment submission to the Department or to the

court with respect to the First Remand Redetermination.  For that reason, the court concludes that

Aisin did not exhaust its administrative remedies as to its challenge to the Department's use of

zeroing methodology in this litigation.  *See Mittal Steel Point Lisas Ltd.*, 548 F.3d at 1383-84

(Fed. Cir. 2008).  However, the court also concludes that the recognized exception to the

exhaustion requirement for an intervening judicial decision applies in this circumstance.  As the

Supreme Court has stated,

> There may always be exceptional cases or particular circumstances which will
> prompt a reviewing or appellate court, where injustice might otherwise result, to
> consider questions of law which were neither pressed nor passed upon by the
> court or administrative agency below.

*Hormel v. Helvering*, 312 U.S. 552 (1941).  The Court of Appeals in *Dongbu*, drawing a

distinction with its past decisions on zeroing, set aside a judgment affirming the use of zeroing in

the final results of an administrative review.  *Dongbu Steel Co.*, 635 F.3d at 1371-73.  The Court

of Appeals ordered that a remand was required so that the Department could explain its

interpreting the language of 19 U.S.C. § 1677(35) inconsistently with respect to the use of

zeroing in investigations and the use of zeroing in administrative reviews.  Because Aisin's

comment submission on the First Remand Redetermination was due on January 15, 2010, prior

to the issuance of the opinion in *Dongbu* on March 31, 2011, the court, exercising its discretion,

waives the exhaustion requirement as to Asahi's claim contesting the use of zeroing in AFBs 17.

Because the court is remanding for further explanation the Department's decision to apply its

zeroing methodology in AFBs 17, the court declines to affirm the redetermination of Aisin's

weighted-average dumping margin.

### III. CONCLUSION

For the reasons discussed in the foregoing, the court will affirm in part, and remand in

part, the Final Results.

### ORDER

Upon consideration of all papers and proceedings herein, it is hereby

**ORDERED** that the final determination of the United States Department of Commerce ("Commerce" or the "Department"), published as *Ball Bearings & Parts Thereof from France, Germany, Italy, Japan, Singapore, & the United Kingdom: Final Results of Antidumping Duty Admin. Reviews & Rescission of Review in Part*, 72 Fed. Reg. 58,053 (Oct. 12, 2007) ("*Final Results*"), be, and hereby is, AFFIRMED IN PART and REMANDED to the Department for redetermination as provided in this Opinion and Order; it is further

**ORDERED** that the Rule 56.2 motions for judgment upon the agency record of Asahi Seiko Co., Ltd. ("Asahi") and NSK Corporation, NSK Ltd., and NSK Precision America, Inc. (collectively, "NSK") be, and hereby are, DENIED; it is further

**ORDERED** that the Rule 56.2 motions for judgment upon the agency record of Aisin Seiki Company, Ltd. and Aisin Holdings of America, Inc. (collectively "Aisin"), JTEKT Corporation, formerly Koyo Seiko Company, Ltd. and Koyo Corporation of U.S.A. (collectively, "JTEKT"), Nachi Technology, Inc., Nachi-Fujikoshi Corporation, and Nachi America, Inc. (collectively "Nachi"), FYH Bearing Units USA, Inc. and Nippon Pillow Block Company Ltd. (collectively, "NPB"), and American NTN Bearing Manufacturing Corp., NTN Bearing Corporation of America, NTN Bower Corporation, NTN Corporation, NTN Driveshaft, Inc., and NTN-BCA Corporation (collectively, "NTN"), be, and hereby are, GRANTED IN PART and DENIED IN PART as provided in this Opinion and Order; it is further

**ORDERED** that Commerce, on remand, shall (1) reconsider its decision to apply its zeroing methodology in the *Final Results* and change that decision or, alternatively, provide an explanation for its express or implied construing of 19 U.S.C. § 1677(35) inconsistently with respect to antidumping duty investigations and administrative reviews; (2) reconsider its rejection of JTEKT's challenge to the third specific match, as identified in this Opinion and Order, for which the information that Commerce excluded from the record raises the factual issue of whether the methodology was misapplied; (3) reconsider its rejection of NPB's proposal to include additional physical characteristics in the model-match methodology; and (4) reconsider NTN's proposal to incorporate into the model-match methodology additional design-type categories and explain its rejection of that proposal with respect to individual bearings described in more than one design type; it is further

**ORDERED** that the resolution in the Redetermination Pursuant to Remand ("First Remand Redetermination") of the issue of the constructed export price of the sales of Aisin's subject merchandise that was affected by the use of the cost and sales data for the further-manufactured goods be, and hereby is, AFFIRMED; it is further

**ORDERED** that Commerce shall redetermine the weighted-average dumping margins of plaintiffs, as appropriate, in complying with this Opinion and Order; it is further

**ORDERED** that Commerce shall have ninety (90) days from the date of this Opinion and Order in which to file its redetermination upon remand ("Second Remand Redetermination"), which shall comply with all directives in this Opinion and Order; it is further

**ORDERED** that plaintiffs shall have thirty (30) days from the filing of the Second Remand Redetermination in which to file comments thereon; it is further

**ORDERED** that defendant and defendant-intervenor The Timken Company ("Timken") shall have thirty (30) days from the filing of plaintiffs' comments to file comments; it is further

**ORDERED** that defendant-intervenor Timken's Motion to Vacate Preliminary Injunction With Respect to Nachi be, and hereby is, DENIED; and it is further

**ORDERED** that plaintiff NTN's Motion to Stay Further Proceedings Pending the Finality of New Antidumping Margin Methodology or, in the Alternative, Motion to Allow Further Briefing and plaintiff NTN's Amended Unopposed Motion for Leave to File a Reply to Defendant's Opposition to the Motion to Stay be, and hereby are, DENIED.

 /s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated: May 5, 2011
          New York, New York